AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of Louisiana

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| SHANNON CHRISTOPHER CEASAR | ) | Case No. |
| | ) | 16-MJ-79 |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

**SEALED**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___1/1/2015 through 7/22/2016___ in the parish of _____Jefferson_____ in the
___Eastern___ District of _____Louisiana_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 115(a)(1)(B) | Threat to assault and/or murder a Federal law enforcement officer, with the intent to impede, intimidate, or interfere with such law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such law enforcement officer on account of the performance of official duties. |
| 21 U.S.C. 841(a)(1) and 846, and 18 U.S.C. § 2 | Illegal dispensing of controlled substances and conspiracy to illegally dispense controlled substances. |

This criminal complaint is based on these facts:

Please see attachment.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Peter Slessi, HHS/OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____07/22/2016_____

_____
*Judge's signature*

City and state: _____New Orleans, Louisiana_____

Honorable Daniel E. Knowles, III, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE**
**FOR CRIMINAL COMPLAINT FOR SHANNON CHRISTOPHER CEASAR**

I, Peter Silessi, being duly sworn, do hereby depose and state as follows:

1.      I am a Special Agent (SA), with the United States Department of Health and Human Services, Office of Inspector General (HHS/OIG), Baton Rouge, Louisiana, and have been so employed in that capacity since July 18, 2010.  I am currently assigned to the HHS/OIG Metairie and my duties include the investigation of drug diversion and healthcare fraud.

2.      I have been and am presently conducting an investigation into a conspiracy to illegally dispense and illegally dispensing controlled dangerous substances that has been occurring since on or before January 1, 2015, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2.

3.      I have also been and am presently conducting an investigation into threats that were issued on or before July 20, 2016 to assault or murder federal law enforcement officers with the intent to impede, intimidate or interfere with such law enforcement officers while engaged in the performance of official duties, or with the intent to retaliate, in violation of Title 18, United States Code, Section 115(a)(1)(B).

4.      I am personally familiar with the facts and circumstances surrounding this investigation from my own investigative activities and from information obtained from other law enforcement officers with personal knowledge of the facts.  Since this affidavit is submitted only for the limited purpose of securing an arrest warrant, I have not set forth each and every fact known to me concerning this investigation.  I have included what I believe are the facts sufficient to establish probable cause for the arrest warrant and search warrants sought.

5.      On March 26, 2015, information was received by the Federal Bureau of Investigation, New Orleans, Louisiana that Shannon Christopher CEASAR, M.D. was

unlawfully prescribing controlled substances to patients in and outside of his clinic, GULF SOUTH PHYSICIANS GROUP (GSPG), located at 3801 Houma Boulevard, Suite 100, Metairie, Louisiana 70006.

6.      As a result, agents developed a confidential source to assist with the investigation. On June 1, 2015, CEASAR and CS #1 had a conversation via text message related to SOI #2. In these text messages, CEASAR described his relationship with SOI #2 and explained how he would provide SOI #2 and SOI #2's sister prescriptions for controlled substances to dispense. The messages reflected that CEASAR and CO-CONSPIRATOR #1 would receive the proceeds from these prescription sales.

7.      On July 9, 2015, CEASAR met CS #1 away from his clinic and provided CS #1 a prescription for 120 Roxicodone 30mg tablets, a Schedule II controlled substance. CEASAR asked CS #1 to fill the prescription and return it to CEASAR so that a third party could dispense it illegally.

8.      On July 16, 2015, CEASAR informed CS #1 that he would be on vacation. As confirmed through United States Customs and Border Patrol, CEASAR traveled from Louisiana to Costa Rica on July 19, 2015 and returned to Louisiana on July 27, 2015. While CEASAR was on vacation, approximately seventy-five (75) prescriptions for controlled substances were filled utilizing his name and Drug Enforcement Administration (DEA) registration number. In conversation with CS #1, CEASAR indicated that CO-CONSPIRATOR #2, who is not authorized to prescribe drugs, would issue prescriptions to patients for him while he was on vacation.

9.      On November 20, 2015, CS #1 provided agents a photograph of prescriptions located inside of CEASAR's vehicle, a 2014 Mustang Shelby GT, with Louisiana license plate

SNK OIL.  The picture reflected multiple prescriptions in the console of the vehicle.  The top prescription was a carbon copy of a prescription dated June 24, 2015, for 120 tablets of Roxicodone 30mg in the name of RICHARD GOULDMAN. GOULDMAN later died of a drug overdose.

10.    On February 16, 2016, CS #1 met with CEASAR.  The meeting was observed by agents.  After the meeting, CS #1 informed agents that CEASAR had provided information to CS #1 regarding the sale of prescriptions.  CEASAR told CS #1 that he sells prescriptions to over twenty people.  CEASAR further informed CS #1 that he "doctored" his patient files to make them look legitimate if he is investigated.

11.    On June 25, 2016, SOI #1 was interviewed and provided information pertaining to his/her relationship with CEASAR.  For a period of approximately ten years, SOI #1's mother (hereinafter referred to as SOI #2) received pain medication prescriptions from CEASAR in exchange for either a payment of $500.00 or sexual intercourse.   When SOI #1 was approximately 12 years old, SOI #1 witnessed CEASAR having sex with SOI #2 while SOI #2 was incapacitated on pain medication.  SOI #2 received the prescriptions in the names of third parties as to avoid law enforcement detection.  Specifically, SOI #2 received prescriptions in the names of RICHARD GOULDMAN and THIRD PARTY-1.

12.    In early 2015, SOI #1 reported that SOI #2 arranged for SOI #1 to begin receiving prescriptions for pain medication on a monthly basis from CEASAR.  In May 2015, SOI #2 died of an overdose of controlled substances, including primarily Oxycodone.  SOI #3 was living with SOI #2 at the time of his/her death.  During an interview, SOI #3 provided agents with a photo of a prescription written to THIRD PARTY-1 by CEASAR for a controlled substance.  The photo was taken while the prescription was in SOI #2's purse in the week before SOI #2 died.

3

13.    In the summer of 2015, shortly after SOI #2's death, SOI #1 was told by CEASAR that he wanted to have sex with SOI #1 as payment for writing prescriptions for SOI #1. SOI #1 began having sexual intercourse with CEASAR in exchange for a pain medication prescription which SOI #1 would then sell for $3,600.00. SOI #1 has had sex with CEASAR, in his office, in exchange for prescriptions approximately ten times. SOI #1 received the prescriptions in the names of third parties in order to avoid detection by law enforcement. Specifically, SOI #1 received prescriptions in the names of RICHARD GOULDMAN, THIRD PARTY-1, THIRD PARTY-2, THIRD PARTY-3, and THIRD PARTY-4. SOI #1 advised agents that he/she knows of multiple individuals who pay CEASAR for prescriptions, including people close to SOI #1.

14.    CEASAR ultimately told SOI #1 that he could no longer write prescriptions for pain medication because he believed he was being investigated by the DEA. However, CEASAR advised SOI #1 that he has "nothing to worry about" because everything is "set up to look legit" with "real MRIs".

15.    On June 27, 2016, in an interview with SOI #4, agents learned that in 2015, SOI #4 was being treated by a doctor who lost his medical license. SOI #4 needed pain medication for his/her back. In a conversation with SOI #1, SOI #1 said that all he/she needed was SOI #4's birthday to get a prescription from CEASAR. Without SOI #4 ever seeing CEASAR, SOI #1 brought back a prescription written to SOI #4 for 120 count of 30 milligram Oxycodone. SOI #4 observed a pill bottle in SOI #1's possession in the name of THIRD PARTY-1.

16.    On March 31, 2016, during a recorded call made by CS #1, CEASAR and CO-CONSPIRATOR #2 had a conversation about an associate of THIRD PARTY-5 being present at the clinic to request pain medication. CEASAR told CS #1 that he asked THIRD PARTY-6 for

medication other than Roxicodone that he could prescribe for THIRD PARTY-6 and his/her associates.

17.     On June 30, 2016, under the direction of agents, CS #2 purchased two prescriptions for controlled substances from CEASAR at his clinic for the sum of $500.00 cash. One of the two prescriptions was for a third party that was not present during the meeting.  A third prescription was promised at a later time.

18.     On July 1, 2016, under the direction of agents, CS #2 returned to the clinic to meet with CEASAR.  CS #2 received a prescription from CEASAR for a third party who was not present for the visit.  The prescription was prescribed for a controlled substance.

19.     Agent surveillance of CEASAR's clinic on various days and times revealed individuals who received prescriptions from CEASAR meeting with him in the back parking lot of the building. Individuals who received prescriptions from CEASAR were also observed entering and exiting the building in a timeframe that does not reflect an office visit.  Surveillance has also revealed activity outside of regular business hours wherein CEASAR stayed at the clinic with various females hours after the parking lot was clear of all other vehicles.  These females received controlled substances from CEASAR.

20.     The information provided by SOI's and the CS's pertaining to the unlawful prescriptions for controlled substances issued by CEASAR between July 22, 2015 and July 22, 2016 were verified through the Louisiana Board of Pharmacy.  SOI #1 received a total of seven hundred thirty-four (734) dosage units of Suboxone 8mg/2mg, a Schedule III controlled substance and seven hundred twenty (720) dosage units of Oxycodone 30mg, a Schedule II controlled substance.   THIRD PARTY-2 received a total of sixty (60) dosage units of Clonazepam .5mg, a Schedule IV controlled substance, ninety (90) dosage units of Hydrocodone

5mg/325mg, a Schedule II controlled substance, and six hundred (600) dosage units of Oxycodone 30mg.   RICHARD GOULDMAN (deceased) received one hundred twenty (120) dosage units of Oxycodone 30mg.   THIRD PARTY-1 received eight hundred forty (840) dosage units of Oxycodone 30mg.   THIRD PARTY-3 received eight hundred forty (840) dosage units of Oxycodone 30mg.   THIRD PARTY-4 received one hundred twenty (120) dosage units of Oxycodone 30mg.

21.     In addition to the aforementioned conspiracy to unlawfully dispense controlled substances, on Thursday, July 21, 2016, your Affiant received information on two recorded telephone calls between CS #1, CS #2 and CEASAR.  During those calls, CEASAR made threats to kill members of the Drug Enforcement Administration and members of the Louisiana State Board of Medical Examiners.

22.     Specifically, in a call made on July 20, 2016 at approximately 11:15 a.m. CST between CS #2 and CEASAR, CEASAR stated the following:

a.   "God help them, I swear to god . . . I have a fucking arsenal in there enough to supply a small militia, you know I collect guns, I swear to god if they come in there with a warrant I'm going to kill every single one of those sons of bitches."

b.   "These motherfuckers are trying to fuck with doctors trying to help people, they're not police, they are the scumbags, they are worse than the scumbags at the police . . . they are pieces of garage. They weren't smart enough to make it to be a real cop so they got . . . to either narcotics and DEA which is a complete and utter failure and waste of time.  No matter who they arrest, no what they do, they will never ever win the war on fucking drugs and they know it, so they get all bent out of shape.  But if they come into my fucking clinic they're going to get a big

6

surprise, because I'm going fucking kill them and send them home in a body bag . . . I'll tell them that to their face.  I'll tell them that to their face.  If you come into my fucking clinic, you're going to get a bullet in your fucking skull."

c.   In response to hearing about the caller's past arrest by law enforcement, CEASAR stated, ". . . I would have gotten in my car and I would have fucking rolled over them or smashed them up against their car and cut them in half.  I'm sick of these motherfuckers, I'm serious. I am fucking serious."

23.   In a second recorded call made on July 20, 2016 at approximately 11:13 p.m. CST between number CS #1 and CEASAR, CEASAR stated the following:

a.   "I am very serious . . . they won't even be able to have an open casket funeral. There will be nothing left above the adam's apple."

b.   "If they come in being assholes, or the medical board, if they happen to fuck with me again, they are all going to die. Every single one of them."

c.    "Fuck it.  I'm going to do what I want and if and when they come they are going to get a big surprise because I'm not just your average doctor.  I'm going to blow their fucking heads off."

d.   "Only a complete and total worthless waste of oxygen piece of garbage human being would not only be a DEA agent period, but to go after doctors when there are fucking drug dealers everywhere, I mean everywhere. That is why they deserve to die."

e.    "And I'm not even sure if the time comes if I'm going to do it right there in the clinic or if I'm going to somehow break into the DEA office in that building by

the lake and just fucking blow the place up but somehow a vast majority of the DEA agents in this area will lose their lives if they fuck with me."

f.  When asked whether the DEA's offices are at Causeway, CEASAR responded, "yep, I know exactly where," and indicated that he had previously been there.

g.  "Same thing goes for the medical board, that'll be even sweeter . . . they are downtown."

h.  "If they come and say we have too many Suboxone patients or anything like that or, you know, any kind of bullshit like that, then . . . New Orleans will be all over the national news again because of me."

i.  "What I'll do is make Baton Rouge look like a fucking kindergarten."

j.  "I can do anything I want."

k.  In response to concerns that he is going to hurt somebody or hurt himself, CEASAR responded, "yeah that's very possible because I'm not joking."

24.  As reflected in the recorded calls, CEASAR's repeated threats against officials from the Drug Enforcement Administration were made in the context of law enforcement officers engaging in the performance of their official duties, including investigation of physicians for violations of federal narcotics laws.

25.  In addition, through the course of the investigation, agents have recovered multiple photos sent from CEASAR to CS #1 displaying over ten firearms in CEASAR's possession.  (See Appendix A in globo).  CEASAR makes reference to his "arsenal" in the recorded calls.

**Conclusion**

Based on the aforementioned factual information, your Affiant respectfully submits that there is probable cause to believe that CEASAR conspired to illegally dispense and illegally dispensed controlled dangerous substances in violation of Title 21, United States Code, Section 841(a)(1) and 846, and Title 18, United States Code, Section 2, and threatened to assault or murder federal law enforcement officers

with the intent to impede, intimidate or interfere with such law enforcement officers while engaged in the performance of official duties, or with the intent to retaliate, in violation of Title 18, United States Code, Section 115(a)(1)(B). Affiant swears that the above information is true and correct to the best of his knowledge.

Respectfully submitted,

Peter Silessi
Special Agent
United States Department of Health and
Human Service, Office of Inspector General

Subscribed and sworn to before
me, this 22nd day of July, 2016.

HONORABLE DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

# APPENDIX A



















